Robert Johnston King (Bar No. 302545)
robert@kingsiegel.com
Julian Burns King (Bar No. 298617)
julian@kingsiegel.com
**KING & SIEGEL LLP**
601 University Ave, Ste 275
Sacramento, CA 95825
tel: (213) 465-4802
fax: (213) 465-4803

Attorney for Plaintiff
Douglas R. Woodall

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**Douglas R. Woodall**, an individual,

Plaintiff,

vs.

**Rhombus Power, Inc.**, a Delaware corporation; and **Does 1-10**, inclusive,

Defendants.

CASE NO.

**COMPLAINT FOR:**

1) **Reprisal in Violation of the Defense Contractor Whistleblower Protection Act, 10 U.S.C. § 4701 (DFARS Subpart 203.9;**
2) **Retaliation in Violation of the FEHA (Cal. Gov. Code § 12940(h);**
3) **Whistleblower Retaliation in Violation of California Labor Code § 1102.5;**
4) **Failure to Prevent Retaliation in Violation of FEHA (Cal. Gov. Code § 12940(k)); and**
5) **Wrongful Termination in Violation of Public Policy**

**<u>Demand for Jury Trial</u>**

King & Siegel LLP

**INTRODUCTION**

1. This is a case about a decorated Army intelligence officer who was punished for insisting that a defense contractor obey the laws that safeguard the nation's most sensitive secrets. Colonel Douglas Woodall (Ret.) served in the United States Army for more than thirty years in roles that required him to work with and safeguard the nation's secrets. He is an expert in the handling of classified information and takes his obligations to secure classified information and report potential violations of security procedures seriously.

2. When Col. Woodall retired, he joined Rhombus Power—a defense contractor that provides AI services to the Armed Forces of the United States and allied governments. Although Col. Woodall excelled at his job, he soon discovered that Rhombus did not share his fidelity to the rules governing the use of classified information.

3. Instead, Rhombus sought to leverage its access to information classified at the highest levels, including Sensitive Compartmented Information ("SCI") to falsely inflate the capabilities of its non-classified products to secure new contracts and retain contracts that it had already entered. Many of these products and intelligence insights were being presented to foreign governments or were available to Rhombus personnel who were themselves un-cleared foreign nationals.

4. When Col. Woodall discovered that Rhombus personnel were accessing SCI information outside of any need to perform its contracted services to the United States he immediately raised concerns and demanded that Rhombus do the right thing; report the violations itself.

5. Instead, Rhombus initiated a campaign of retaliation. Rhombus CEO Anshu Roy personally directed that Col. Woodall be removed from briefings because he was no longer in the "circle of trust," and turned the company's investigative machinery on Col. Woodall himself rather than on the violations he had identified. Rhombus even weaponized the federal security-clearance system against him, filing

a report with the Defense Counterintelligence and Security Agency that falsely painted this decorated intelligence officer as mentally unstable—less than a day after its own General Counsel promised him in writing that he would not be retaliated against.

6. When Woodall continued to escalate concerns about Rhombus' misuse of classified information and threatened to report the issues to the government himself, the company placed him on "administrative leave" and confiscated his laptop just two weeks after his October 20, 2025, complaint. Several weeks later Rhombus terminated Col. Woodall as part of a fake reorganization. The company promptly rehired many of the other employees that were "laid off" to give the company cover when it fired Col. Woodall.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over Plaintiff's First Cause of Action under 28 U.S.C. § 1331 because it arises under the laws of the United States, specifically the Defense Contractor Whistleblower Protection Act, 10 U.S.C. § 4701, which authorizes a covered contractor employee to bring a de novo civil action in the appropriate United States district court.

8. This Court has supplemental jurisdiction over Plaintiff's Second through Fifth Causes of Action under 28 U.S.C. § 1367 because those state-law claims are so related to the federal claim that they form part of the same case or controversy. All of Plaintiff's claims arise from a common nucleus of operative facts.

9. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant Rhombus Power, Inc. maintains its principal place of business in this District, at Stanford Research Park, 3200 Hillview Avenue, Palo Alto, California 94304, and because a substantial part of the events and omissions giving rise to Plaintiff's claims—including the decisions to retaliate against and terminate Plaintiff—occurred in this District. Assignment to the San Jose Division is appropriate under Civil Local Rule 3-2(c) because the events at issue arose in Santa



King & Siegel LLP

Clara County.

**PARTIES**

10. Plaintiff **Douglas R. Woodall** is a Colonel in the United States Army (Retired) and is a combat veteran with a one-hundred-percent service-connected disability rating. From July 31, 2023, until his termination on November 18, 2025, he was employed by Defendant Rhombus Power, Inc., most recently as Vice President of Warfighting.

11. Defendant **Rhombus Power, Inc.** ("Rhombus" or the "Company") is, on information and belief, a corporation organized under the laws of the State of Delaware, with its principal place of business at Stanford Research Park, 3200 Hillview Avenue, Palo Alto, California 94304.

12. Rhombus was founded in 2011 and develops AI-driven software for the national security and defense sectors and markets that technology to the U.S. Department of Defense, the military services, and allied governments and intelligence agencies. Rhombus has secured federal contracts with the Department of Defense and the Air Force for networked command, control, and communications capabilities, including cloud-agnostic data-management work performed under the Advanced Battle Management System (ABMS) program.

13. Rhombus's flagship product is Guardian. Rhombus describes Guardian as an artificial intelligence platform that transforms decision-making in defense and national security environments, integrating AI models and data analytics to help governments, militaries, and intelligence agencies anticipate threats, allocate resources, and respond to crises. Guardian purportedly fuses data from multiple domains—including open-source intelligence, social media, and other sources—to build situational awareness, and Rhombus markets Guardian capabilities that include joint threat reporting, crisis-escalation modeling, adversary-behavior modeling, political-instability forecasting, and indicators for so-called "black swan" events. Rhombus has publicly stated that Guardian identified the coming invasion



King & Siegel LLP

King & Siegel LLP

of Ukraine before it began.

14. Rhombus also markets an AI-driven resourcing-intelligence application for defense budgeting and force planning. Rhombus describes this product as enabling users to model trade-offs, simulate outcomes, and optimize budget cycles, with capabilities including budget trade-off simulation, personnel planning, asset-readiness tracking, force-structure optimization, and readiness forecasting. Rhombus claims the product has flagged billions of dollars at risk in vulnerable programs and automated workflows that saved thousands of manpower hours.

15. Rhombus offers Artemis AI, a generative-AI application that integrates with Guardian and allows users to not only track but also shape the public information environment. Rhombus describes Artemis as scanning open-source intelligence and data en masse—from social media to embassy statements—to identify potential threats, growing dissent, or misinformation and propaganda campaigns, to surface the individuals driving those narratives, and to give users the ability to craft targeted responses to them. Rhombus developed Artemis in collaboration with the Defense Innovation Unit and markets the tool to U.S. intelligence users to track threats and misinformation and to shape narratives.

16. Rhombus markets Ambient Edge AI, which it describes as an application for on-premise intelligence fusion. Ambient Edge AI extends Rhombus's data-fusion capabilities to local, on-site deployment rather than relying solely on cloud-based processing.

17. Rhombus offers additional targeted applications; Nautilus AI, which it describes as a generative-AI application for monitoring and predicting threats to submarine cables; GeoPOP, which it describes as an AI application for predicting space operations; Haven AI, an application for natural-disaster monitoring and prediction that it launched in May 2025; and Trace, which it describes as an AI application to fight transnational crime.

King & Siegel LLP

18. Rhombus develops artificial-intelligence products in support of United States national-security and intelligence missions and performed work under contracts with the United States Department of Defense, including United States Special Operations Command ("USSOCOM"). Rhombus performed work that involved access to (and thus was classified under) various classified markings, including Secret, Top Secret ("TS") and Top Secret-Sensitive Compartmented Information ("TS-SCI" or "SCI").

19. At all relevant times, Rhombus was a "contractor" within the meaning of 10 U.S.C. § 4701 and an "employer" within the meaning of the California Labor Code and the California Fair Employment and Housing Act ("FEHA"). On information and belief, Rhombus regularly employs five or more persons.

20. Plaintiff is presently unaware of the true names and capacities of the defendants sued as Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

21. At all times alleged in this Complaint, each Defendant was an agent, servant, joint employer, employee, partner, and/or joint venturer of every other Defendant and was acting within the scope of that relationship. Moreover, the conduct of every Defendant was ratified by each other Defendant.

## FACTUAL ALLEGATIONS

### Background on Classified Information and Federal Contractors

22. Access to classified information runs through two independent gates, and a company must satisfy both before any classified work occurs. First, the company itself must hold a facility security clearance ("FCL"), sponsored by a government customer and granted and continuously monitored by the Defense Counterintelligence and Security Agency ("DCSA") under the National Industrial Security Program (Exec. Order No. 12829; National Industrial Security Program Operating Manual, 32 C.F.R. pt. 117). Second, each individual that accesses

King & Siegel LLP

classified information while performing work for the contractor must hold a personnel security clearance at the appropriate level—Confidential, Secret, or Top Secret—and, for Sensitive Compartmented Information, must be separately "read on," or indoctrinated, into the specific compartment. A clearance establishes eligibility only; it is never, standing alone, permission to see any particular information.

23. Access to classified information is governed by the "need-to-know," principle and it is deliberately narrow. In other words, regardless of a person's clearance level they are only permitted to access information that they have a legitimate need to know as part of their work for the United States.

24. Classified information can only be accessed in connect with a lawful, current requirement—a specific contract, program, or mission. An individual should be read on to a program only while a contractual or mission basis for that access exists, and the access is meant to be least-privilege: no more than the specific information the person requires to perform the work. When the underlying contract or program ends, the basis for access ends with it, and the company must promptly read the affected personnel off and formally debrief them. Continued access after a contract closes is a security violation, because the lawful predicate for the access no longer exists.

25. Classified and unclassified information must live in physically and logically separate environments, and the boundary between them must be strictly policed. Classified information may be created, stored, processed, and transmitted only within accredited systems and spaces: information systems authorized to operate at the relevant classification level and kept separate from unclassified networks (whether by air-gap or by an approved cross-domain solution), and, for SCI, only within a Sensitive Compartmented Information Facility ("SCIF") accredited under Intelligence Community Directive 705. Classified material is never permitted to touch unclassified infrastructure—commercial email, ordinary

King & Siegel LLP

collaboration or cloud platforms, or personal devices. All classified material must also be properly marked so that anyone handling it can immediately identify its classification level and any dissemination controls.

26. Every cleared company must build and maintain a security apparatus headed by a Facility Security Officer ("FSO"). The FSO supervises and directs the company's security program, trains cleared personnel, enforces the safeguarding rules, and serves as the company's interface with DCSA; programs involving SCI additionally rely on Special Security Officers to manage compartmented access. The company is also required to maintain an insider-threat program (32 C.F.R. § 117.7(b)). Critically, the FSO's professional obligation runs to the protection of the information and the integrity of the security program—not to the business convenience of the employer. An FSO who defers to commercial pressure over security obligations, or who is unqualified to perform the role, is a compliance failure.

27. The system depends on continuous, affirmative reporting rather than concealment. Cleared companies and personnel must promptly report adverse information, security violations, and any spillage or contamination—classified information that has reached an unclassified system—and must contain and remediate it in coordination with the FSO and DCSA. Personnel with SCI access carry additional continuous-reporting obligations under Security Executive Agent Directive 3 ("SEAD 3"), including reporting foreign contacts, foreign travel, and suspicious approaches.

28. Finally, sharing classified or controlled U.S. information with foreign nationals or foreign governments is tightly restricted, and a contractor may never make that decision unilaterally. Foreign disclosure requires specific, documented authorization through established foreign-disclosure channels, and dissemination-control markings govern releasability—for example, "NOFORN" bars release to any foreign recipient, and "REL TO" limits release to designated partners. A company

may not advertise, hint at, or trade on its classified U.S. government work to court foreign customers, and technical data may be independently subject to export controls under the International Traffic in Arms Regulations ("ITAR") and Export Administration Regulations ("EAR").

**Colonel Woodall's Background and Distinguished Service**

29. Colonel Douglas Woodall served as a commissioned officer in the U.S. Army for 30 years, beginning in 1993 after completing an undergraduate degree in chemical engineering at the University of Wyoming. He spent roughly half his career in special operations, completing two tours in Korea and supporting operations in Bosnia/Kosovo, Iraq (two tours), and Afghanistan (two tours).

30. His senior command positions included battalion and squadron commander at Joint Special Operations Command (JSOC), and he served as a Battalion Commander in Afghanistan of an intelligence task force.

31. Woodall's intelligence expertise culminated in a series of high-level command and advisory positions. From 2016 to 2017, he served as the J2—the senior intelligence officer—for Combined Joint Task Force-Horn of Africa (CJTF-HOA), with responsibility across ten countries in eastern Africa. He subsequently became Chief of Staff of Fort Huachuca, the U.S. Army Intelligence Center, before commanding the Joint Intelligence Operations Center at U.S. Strategic Command (STRATCOM) from 2019 to 2021. He then served as Executive Assistant to Admiral Charles Richard, the four-star commander of U.S. Strategic Command.

32. His Army career gave him deep expertise in warfighting operations, intelligence, and the handling of classified national-security information—the very expertise Rhombus hired him to bring to its work supporting United States Combatant Commands.

33. Because of his military service and clearances, Col. Woodall understood, and took seriously, the legal obligations that attach to access to classified information and SCI materials, including the duty of cleared personnel to



King & Siegel LLP

report suspected security violations, unauthorized disclosures, and unreported foreign contacts.

**<u>Woodall's Hiring and Rapid Advancement</u>**

34. On July 25, 2023, Col. Woodall accepted Rhombus's written offer of employment as a Client Success Manager. Col. Woodall was designated to report to Senior Director of Client Services Dave Hudak, to Vice President of Operations Dr. Sarah Cowan for client duties, and to Chief Executive Officer Dr. Anshu Roy for business-development duties.

35. The offer letter expressly designated California as the law governing Col. Woodall's employment relationship with Rhombus.

36. Col. Woodall excelled. He helped Rhombus obtain another contract to work with STRATCOM and helped close a deal with USSOCOM which began in September of 2023 and was renewed for a second year due to his efforts.

37. Rhombus decided to consolidate its sales and customer support functions under a single umbrella, "Warfighting," and on December 22, 2023, CEO Roy promoted Col. Woodall to Director of Warfighting. In a written exchange memorializing the promotion, Col. Woodall thanked Roy "for your trust and confidence in me," and Roy replied, "I believe in you."

38. In or around the summer of 2024, Rhombus promoted Col. Woodall again, to Vice President of Warfighting—the title he held at the time of his termination.

39. On November 13, 2024, Director of People Operations Melissa Fehl gave Col. Woodall his annual review and a corresponding raise, increasing his base salary and writing: "Thank you for your exceptional effort in all you do, and we look forward to you bringing your best to our ongoing and new lines of work!"

**<u>Rhombus' Misuse of Classified Information</u>**

40. Col. Woodall noticed warning signs about Rhombus' treatment of classified information early during his time with the company. In October 2023, the



King & Siegel LLP

company hosted a meeting with Korean Defense Intelligence Agency (KDIA) officials. At that meeting, CEO Anshu Roy went into detail about the classified work that the company was doing for the US and the Korean foreign intelligence representatives responded by asking whether going on contract with Rhombus would allow them to "bypass the US government and get access to their classified data." Col. Woodall was forced to intervene and shut down the discussion.

41. In another incident, Rhombus CEO Anshu Roy uploaded classified documents that he received from the Dr. Rohan Gunaratna to an unclassified system. When Col. Woodall became aware of the incident, he demanded that Rhombus immediately report the incident as required by the National Industrial Security Program Operating Manual (32 C.F.R. Part 117), SEAD 3, and applicable Intelligence Community Directives.

42. Dr. Cowan initially refused to do so, claiming that the breach did not need to be reported because the information wasn't classified by the US Government. Rhombus only relented and reported the breach after Col. Woodall pressured the Facility Security Officer at the time, Mike McGehee, telling him that Col. Woodall would report the incident if the company did not.

43. Shortly after the incident with the classified Philippines information the FSO resigned and Rhombus promoted Mark Hughes to the FSO position. Hughes was previously in charge of facilities management for Rhombus and had little to no experience in handling classified materials.

44. During his tenure with Rhombus, Col. Woodall became aware of several instances where Rhombus personnel were accessing classified information that was outside of the scope of the project that they were actively working on—raising serious concerns about misuse of classified information.

45. In January 2025, Hughes submitted a Visit Access Request ("VAR") to access a SCIF for Jonathan Baham before Baham had completed his SCI read-in. When Woodall asked Hughes why Baham was included on SCI-related emails;



King & Siegel LLP

Hughes confirmed that SVP Cowan directed the addition "in case Grant Miller couldn't attend a meeting," and that Baham "was still in the process of getting SCI read in," acknowledging this "takes time, won't happen overnight." Hughes confirmed he had sent the VAR for Baham the day before, knowing Baham was not yet cleared for SCI access.

46. Rhombus performed work for Headquarters Air Force ("HAF") under several contracts—an OTA contract that was awarded in September 2020 and ended in September 2025. The OTA contract contemplated work that did not require SCI access. Rhombus was also awarded a continuing contract in September 2025, which similarly did not require SCI access. Nonetheless, Rhombus read several of its employees into SCI access through the HAF contract, including Sarah Cowan, Anshu Roy, Abhishek Sharma, Rhombus' Senior Vice President of Engineering, Mitch Schull, Rhombus' Director of Geospatial Engineering, and others.

47. Roy Fatur, Rhombus's Senior Director for the Headquarters Air Force account, raised concerns with FSO Hughes about unauthorized access to SCI systems by Rhombus employees in connection with the HAF contract in or around September 2025. Rhombus did not act on these concerns.

48. Rhombus similarly obtained access to SCI information for its personnel through the USSOCOM contract that it entered in approximately September of 2023. Rhombus obtained SCI access for Bruce Frost, Jon Baham, and Eric Gardzina, none of whom performed classified work nor any work for USSOCOM. Sangram Ganguly, Rhombus' Chief Technical Officer was also read on to SCI through the USSOCOM contract.

49. In May of 2025, Sangram discussed verifying data in a sales pitch to the Indian government with "high side data," a reference to classified information. In other words, Rhombus was using classified information to strengthen the "analysis" that it was sharing with foreign governments to make it appear as though Rhombus' unclassified offerings could offer greater detail and capacity than those unclassified



King & Siegel LLP

offerings could actually provide.

50. Between May and August 2025, cleared Rhombus personnel with SCI access were producing intelligence products to answer direct questions posed by Philippine senior government officials. At the same time these individuals, many of whom had no legitimate reason to access SCI were routinely visiting SCIFs at management's direction.

51. On August 14, 2025, CTO Sangram Ganguly directed Abhishek Sharma to travel to the Westway SCIF specifically to support the unclassified Joint Fires Network (JFN) contract. Sharma also acknowledged accessing classified material in connection with JFN work, writing that "what I looked on the high side and communicated to Sangram and Jon was to make sure that they are aware of what those guys can easily see." Woodall flagged this exchange to Hughes as a potential classified spillage into the unclassified JFN contract, but the company took no reporting action.

**<u>Col. Woodall Reports Grave National-Security Violations</u>**

52. Rhombus performed classified work for USSOCOM under a contract identified as OTA FA8726-20-9-0007, Delivery Order 0018. The contract's Period of Performance ended on September 24, 2025. From that date forward, there was no contractual basis under USSOCOM's SCI cognizance for Rhombus personnel to remain read-on to SCI, and the Company was obligated to administratively read its personnel off and to coordinate with the USSOCOM Special Security Office ("SSO").

53. But Rhombus did not read its personnel off SCI access. On September 30, 2025, Rhombus's Facility Security Officer, Mark Hughes, contacted Col. Woodall about the SOCOM team's SCI status. Col. Woodall directed Hughes to immediately end or transfer all SCI access and to contact Dr. Cowan and the USSOCOM SSO immediately. But Rhombus refused.

54. On October 3, 2025—nine days after the contract ended—Hughes admitted in writing on Microsoft Teams: "I have not contacted SOCOM since our



King & Siegel LLP

contract ended." Hughes provided a roster identifying seven Rhombus personnel who remained read-on to USSOCOM SCI notwithstanding the contract's expiration, including Col. Woodall himself, as well as Bruce Frost and Jon Baham, who should never have been read-on to SCI under the USSOCOM contract in the first place.

55. On October 10, 2025, Col. Woodall attended a Rhombus all-hands meeting in Palo Alto, California. At the meeting, CEO Roy showed open-source video of a senior foreign national-security official describing his meetings with Roy, stating that Roy had described United States Government work performed by Rhombus. Immediately afterward, Col. Woodall asked Hughes whether the CEO's foreign-intelligence-service contacts and foreign travel had been reported, given the CEO's SCI clearance. Hughes confirmed they had not been reported and that he had not been given visibility into the full scope of the CEO's foreign work.

56. On or about October 17, 2025, Col. Woodall received reports that Rhombus personnel—including Bruce Frost, Jon Baham, and others—were repeatedly accessing the Westway LLC Sensitive Compartmented Information Facility ("SCIF") under USSOCOM SCI cognizance despite performing no work under the SOCOM contract, having no contractual need-to-know, and despite the fact that the contract had already ended.

57. On October 20, 2025, Col. Woodall delivered a formal whistleblower letter to CEO Roy, Director of People Operations Fehl, and General Counsel Balkin. Col. Woodall wrote:

> *I have observed practices that I believe constitute improper handling of sensitive materials, potential violations of federal laws and regulations, and lapses in security protocols that could compromise national security interests. These issues include mishandling of classified data, irregularities in contract fulfillment, inadequate security measures in AI-driven intelligence integration, potential activities such as sharing sensitive information with foreign governments without proper clearance, security*



King & Siegel LLP

*concerns with personnel misusing classified information, having those personnel face customers against my recommendations, concerns of espionage through unauthorized access and sharing of JWICS-related information, and potentially supporting foreign nations with classified insights without authorization. Additionally, I am deeply concerned about personnel accessing Sensitive Compartmented Information (SCI) without a legitimate contractual "need to know," which violates fundamental classification principles and could lead to severe contractual and legal repercussions.*

58. Mr. Woodall's letter noted these actions potentially violated a host of federal laws and continued that "In light of Rhombus Power's involvement in AI technologies supporting U.S. intelligence and defense efforts, I have an obligation to the company and government to report potential wrongdoing as a whistleblower" but that he wanted to give Rhombus the opportunity to do the right thing and investigate and report any violations. He requested that Rhombus respond to him within 72 hours "given the sensitive nature of the potential espionage involved" and warned that if the company did not address his concerns he would "immediately proceed with contacting the DNI IG, the DOW IG, the FBI, and the DCSA to ensure that these matters are investigated thoroughly."

59. On October 21, Col. Woodall emailed Roy, Fatur, Hughes, and Balkin to raise additional concerns that Rhombus was accessing SCI in order to support its unclassified work for the Joint Fires Network—using personnel read onto SCI through the HAF contract and/or the USSOCOM contract. Woodall again recommended that the company immediately report these violations as it was required to do.

60. The morning of October 22, Col. Woodall sent an email to Balkin and Hughes raising specific concerns about Jon Baham and Bruce Frost accessing SCI



King & Siegel LLP

information outside of their scope of work and in support of other work that Rhombus was performing or attempting to sign up. Col. Woodall again highlighted the need for the company to report these potential violations.

**The Sham Investigation**

61. On October 22, 2025, Rhombus retained the law firm Pillsbury Winthrop Shaw Pittman LLP as outside counsel, and Col. Woodall objected that his whistleblower letter had been shared with the firm without his authorization. General Counsel Balkin provided a written anti-retaliation assurance, stating: “please understand that we do not permit retaliation against an employee who brings concerns to the attention of the Company, and you will not be subjected to retaliation for raising your concerns.”

62. Notwithstanding this promise, Rhombus proceeded to systematically cut Col. Woodall off from his own work and team. On October 22, 2025, Dr. Cowan contacted Col. Woodall’s subordinates directly, bypassing him, and Col. Woodall flagged the conduct to Human Resources and the General Counsel as possible retaliation. On October 31, 2025, Rhombus removed Col. Woodall from the United States Forces Korea (“USFK”) effort, even as his subordinate Eric Coger continued to flag Col. Woodall’s importance to that work.

63. On October 23, 2025—less than twenty-four hours after General Counsel Balkin’s written promise of no retaliation, and less than twenty-four hours after Col. Woodall’s written escalation of the Baham and Frost SCIF-access concerns—Rhombus, through its Facility Security Officer, submitted an incident report to DCSA. The report characterized Col. Woodall as exhibiting “apparent or suspected mental health issues” and “erratic behavior,” and cited “Personal Conduct, Psychological Conditions” as the basis for the report. Rhombus thereby turned a federal personnel-security reporting channel—a mechanism that exists to protect classified information—into a weapon against the very employee who had reported the Company’s security failures.



King & Siegel LLP

64. On November 1, 2025, CEO Roy telephoned Col. Woodall's subordinate Bill Ellis and instructed him to delete a recurring update chat that had been shared with Col. Woodall, Dr. Cowan, and Roy, telling Ellis that Col. Woodall was "no longer in the circle of trust" and was not to receive any further information.

**Rhombus Places Col. Woodall on Leave and Fires Him in a Fake Reorganization**

65. On November 4, 2025, Rhombus placed Col. Woodall on paid administrative leave, effective immediately, in a letter signed by Director of People Operations Fehl, stating that the action was taken "due to your recent behavior that has raised serious concerns regarding your judgment and ability to complete your duties." The letter asserted that the action was "not disciplinary or retaliatory" but a "temporary and precautionary measure," and directed Col. Woodall to return his Company laptop and phone the next day.

66. On November 6, 2025, Col. Woodall personally contacted the USSOCOM SSO. The SSO confirmed that Rhombus personnel remained read-on to SCI despite being off contract since September 24, 2025—corroborating exactly what Col. Woodall had been reporting internally for weeks. Col. Woodall directed that the personnel be administratively read off and notified the cognizant USSOCOM officials.

67. On November 12, 2025, Col. Woodall provided sworn testimony to the Intelligence Community Inspector General regarding reprisal and the reporting of an urgent concern to Congress. On November 16, 2025, he filed a reprisal complaint with the Department of Defense Hotline, alleging reprisal under 10 U.S.C. § 4701.

68. Two days later, on November 18, 2025, at 4:56 p.m., Director of People Operations Fehl notified Col. Woodall by email that "Rhombus has decided to eliminate the Warfighting department," effective immediately, and offered one week of severance and one month of COBRA coverage for each year worked.

69. The "department elimination" was a pretext. On information and



King & Siegel LLP

belief, within a short time after the November 18, 2025, layoff, Rhombus rehired many of the same employees it had purported to lay off in the supposed elimination of the Warfighting department.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

70. Defense Contractor Whistleblower Protection Act (10 U.S.C. § 4701). On November 16, 2025, Col. Woodall submitted a reprisal complaint to the Department of Defense Inspector General (via the Department of Defense Hotline) alleging reprisal in violation of 10 U.S.C. § 4701, arising from the same protected disclosures and adverse actions alleged in this Complaint.

71. More than 210 days have elapsed since Col. Woodall submitted his reprisal complaint to the Inspector General, and the Inspector General has not issued a determination resolving the merits of his reprisal allegations. Col. Woodall has therefore exhausted his administrative remedies and is entitled to bring a de novo action in this Court under 10 U.S.C. § 4701(c)(2). This action is timely brought within the period prescribed by that statute.

**72.** California Fair Employment and Housing Act. Prior to filing this Complaint, Col. Woodall timely filed a complaint with the California Civil Rights Department and obtained a right-to-sue letter authorizing him to enforce his rights under FEHA through this civil action. A copy is attached as **Exhibit A.**

**FIRST CAUSE OF ACTION**

***Reprisal in Violation of the Defense Contractor Whistleblower Protection Act 10 U.S.C. § 4701; DFARS Subpart 203.9***

**(Plaintiff Against Defendant Rhombus Power, Inc. and Does 1–10)**

73. Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

74. The Defense Contractor Whistleblower Protection Act, 10 U.S.C. § 4701, prohibits a contractor from discharging, demoting, or otherwise discriminating against an employee as a reprisal for disclosing, to a person or body



King & Siegel LLP

specified in the statute, information that the employee reasonably believes is evidence of gross mismanagement of a Department of Defense contract, a gross waste of Department of Defense funds, an abuse of authority relating to a Department of Defense contract, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Department of Defense contract. Protected recipients include an Inspector General; the Federal Bureau of Investigation; a Member of Congress; a Department of Defense employee responsible for contract oversight or management; and a management official or other employee of the contractor who has the responsibility to investigate, discover, or address misconduct. The statute is implemented for Department of Defense contractors at DFARS Subpart 203.9.

75. Col. Woodall was an employee of a Department of Defense contractor and engaged in activity protected by 10 U.S.C. § 4701. He made disclosures he reasonably believed evidenced gross mismanagement of, gross waste under, abuse of authority relating to, a substantial and specific danger arising from, and violations of law and regulation related to a Department of Defense contract—including the continued SCI read-on of personnel after the USSOCOM contract ended, the misuse of classified facilities by personnel with no contractual need-to-know, unreported foreign contacts, and potential espionage. He made these disclosures to protected recipients, including FSO Hughes and other Rhombus management officials responsible for addressing such misconduct, the Department of Defense Inspector General, the DCSA and others.

76. Col. Woodall reasonably believed that the conduct he reported constituted gross mismanagement of a Department of Defense contract, gross waste of Department of Defense funds, an abuse of authority relating to a Department of Defense contract, a substantial and specific danger to public safety and national security, and violations of federal law and regulation relating to a Department of Defense contract—including the federal espionage statutes (18 U.S.C. §§ 793, 794,



King & Siegel LLP

798), the National Industrial Security Program Operating Manual (32 C.F.R. Part 117), Security Executive Agent Directive 3, and Intelligence Community Directive 704.

77. Rhombus took adverse personnel actions against Col. Woodall, including filing a false personnel-security report, excluding him from his work and team, placing him on administrative leave, and terminating his employment. Col. Woodall's protected disclosures were a contributing factor in each of these actions, as demonstrated by, among other things, the close temporal proximity between his disclosures and the adverse actions, the knowledge of the relevant decisionmakers, and the pretextual nature of the stated reasons. Rhombus cannot demonstrate by clear and convincing evidence that it would have taken the same actions in the absence of Col. Woodall's protected disclosures. *See* 10 U.S.C. § 4701(c)(6) (incorporating the burdens of proof of 5 U.S.C. § 1221(e)).

78. As a direct and proximate result of Rhombus's reprisal, Col. Woodall has suffered and continues to suffer damages, including lost wages, back pay, lost employment benefits, lost future earnings, and other compensable harm in an amount to be proven at trial.

79. Because of Rhombus's conduct, Col. Woodall retained counsel to prosecute his retaliation claim and is entitled to recover reasonable attorney's fees and costs, including expert fees.

**<u>SECOND CAUSE OF ACTION</u>**

***Retaliation in Violation of the Fair Employment and Housing Act***

***Cal. Gov. Code § 12940(h)***

**(Plaintiff Against Defendant Rhombus Power, Inc. and Does 1–10)**

80. Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

81. FEHA, California Government Code § 12940(h), makes it unlawful for an employer to discharge, expel, or otherwise discriminate against any person



King & Siegel LLP

because the person has opposed any practice forbidden under FEHA. Opposing the sexual harassment of a coworker or subordinate is protected activity, and an employee need not be the direct target of the harassment to be protected when opposing it.

82. In or around early August 2025, a female subordinate of Col. Woodall's, Noreeza Khan, traveled on a Rhombus business trip to Ukraine. During that trip Ms. Khan was sexually harassed by Ukrainian military officials. One official would touch his crotch area while looking at Ms. Khan and say, "good god I need to remember I am married." The same official repeatedly asked Ms. Khan if she was bisexual and referred to another woman as "the prostitute" or the "naked woman" because of how she dressed. The official also would say things such as "what are we talking about, sex, drugs, and fucking" when joining conversations.

83. On September 19, 2025, after CEO Roy contacted Col. Woodall in the evening expressing anger about Ms. Khan and "what happened in Ukraine," Col. Woodall spoke with Ms. Khan, who reported that she had been subjected to sexual harassment, among other misconduct, during the trip.

84. Col. Woodall promptly reported the harassment to senior leadership. He raised it with CEO Roy and with Dr. Cowan, who acknowledged on the telephone "that there were some Ukrainians making comments," and Col. Woodall requested that an investigation begin immediately.

85. On September 22, 2025, Dr. Cowan proposed reassigning Ms. Khan. Col. Woodall again contacted General Counsel Balkin about the proposed personnel move and the underlying sexual-harassment concern. Balkin responded that she had not been "read into anything re: Noreeza" and would follow up. Rhombus's Human Resources function did not reach out about the Ukraine harassment matter until on or about September 29, 2025—roughly a week after Col. Woodall first escalated it.

86. On October 20, 2025, Col. Woodall submitted a written Code of



King & Siegel LLP

King & Siegel LLP

Conduct violation report to Director of People Operations Fehl and General Counsel Balkin, at 8:32 a.m., reporting that a Rhombus employee, Ellen Chapin, was spreading derogatory workplace gossip about Ms. Khan relating to the events in Ukraine. The report alleged violations of Rhombus's Code of Conduct, which had taken effect on October 13, 2025, including harassment and derogatory remarks directed at a female employee.

87. Col. Woodall engaged in protected activity when, beginning on or about September 19, 2025, he reported and opposed the sexual harassment of his subordinate, Noreeza Khan, to CEO Roy, Dr. Cowan, and General Counsel Balkin; when he directed that the harassment be investigated; and when, on October 20, 2025, he submitted a written Code of Conduct violation report opposing the harassment-based derogatory conduct directed at Ms. Khan. Rhombus, through its agents, knew of this protected activity.

88. Rhombus subjected Col. Woodall to adverse employment actions, including his exclusion from his work and team, his placement on administrative leave, and his termination. Col. Woodall's opposition to the sexual harassment of Ms. Khan was a substantial motivating reason for these adverse actions. The retaliatory motive is corroborated by, among other things, the temporal proximity between Col. Woodall's opposition and the adverse actions, and by Rhombus's decision to terminate, in the same purported "reduction in force," both Ms. Khan and Kevin Gunaratna, who had reported related harassment-based misconduct.

89. As a direct and proximate result, Col. Woodall has suffered and continues to suffer damages, including lost wages, back pay, front pay, lost benefits, and lost future earnings, together with severe emotional distress, in amounts to be proven at trial. Because of Rhombus's conduct, Col. Woodall retained counsel to prosecute his FEHA claim and is entitled to recover reasonable attorney's fees and costs, including expert fees, under California Government Code § 12965.

90. Rhombus's conduct was intentional, deliberate, willful, malicious,

reckless, and conducted in callous disregard for Col. Woodall's rights, and was committed and/or ratified by Rhombus's officers, directors, or managing agents, entitling Col. Woodall to punitive damages.

**<u>THIRD CAUSE OF ACTION</u>**

***Whistleblower Retaliation***

***Cal. Lab. Code § 1102.5***

**(Plaintiff Against Defendant Rhombus Power, Inc. and Does 1–10)**

91. Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

92. California Labor Code § 1102.5 prohibits an employer from retaliating against an employee for disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee with authority to investigate, discover, or correct the violation, where the employee has reasonable cause to believe the information discloses a violation of a state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation. The disclosure need not be to an external agency, and the employee's belief need only be reasonable, not correct.

93. Col. Woodall engaged in protected activity under § 1102.5 when he disclosed—to CEO Roy, General Counsel Balkin, FSO Hughes, and other persons with authority at Rhombus, and to government agencies including the Department of Defense Inspector General, DCSA, and others—information he reasonably believed evidenced violations of federal law and regulation, including the federal espionage statutes (18 U.S.C. §§ 793, 794, 798), the National Industrial Security Program Operating Manual (32 C.F.R. Part 117), Security Executive Agent Directive 3, and Intelligence Community Directive 704, concerning the unauthorized retention of and access to classified information and SCI.

94. Woodall also engaged in protected activity by raising concerns



King & Siegel LLP

King & Siegel LLP

regarding sexual harassment of Ms. Khan.

95. Rhombus subjected Col. Woodall to adverse employment actions, including the false October 23, 2025, personnel-security report, his exclusion from his work and team, the denial and delay of his leave request, his November 4, 2025 placement on administrative leave, and his November 18, 2025 termination. Col. Woodall's protected disclosures were a contributing factor in each adverse action.

96. As a direct and proximate result, Col. Woodall has suffered and continues to suffer damages, including lost wages, back pay, front pay, lost benefits, and lost future earnings, together with severe emotional distress, in amounts to be proven at trial. Col. Woodall is entitled to recover lost wages, back pay, front pay, reinstatement, and reasonable attorney's fees pursuant to California Labor Code § 1102.5(j). Rhombus is further subject to a civil penalty of $10,000 per violation under California Labor Code § 1102.5(f).

## FOURTH CAUSE OF ACTION

***Failure to Prevent Retaliation in Violation of the FEHA***

***Cal. Gov. Code § 12940(k)***

**(Plaintiff Against Defendant Rhombus Power, Inc. and Does 1–10)**

97. Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

98. The FEHA, California Government Code § 12940(k), makes it an unlawful employment practice for an employer to fail to take all reasonable steps necessary to prevent discrimination, harassment, and retaliation from occurring. This duty obligates an employer not only to refrain from prohibited conduct but to maintain and enforce effective policies, to investigate complaints, and to take prompt corrective action when it knows or should know that prohibited conduct is occurring or is likely to occur.

99. As alleged in the Second Cause of Action, Col. Woodall was subjected to retaliation in violation of FEHA because he opposed the sexual harassment of his

King & Siegel LLP

subordinate, Ms. Khan. That underlying FEHA violation is incorporated here as the predicate for this claim.

100. Rhombus knew, or in the exercise of reasonable care should have known, that Col. Woodall faced a serious risk of retaliation after he opposed the harassment of Ms. Khan and reported it to the company's most senior officers, including its Chief Executive Officer and its General Counsel. Indeed, on October 22, 2025, General Counsel Balkin expressly assured Col. Woodall in writing that he would not be subjected to retaliation—an assurance that confirms Rhombus's actual awareness of the risk. Despite that knowledge, Rhombus failed to take all reasonable steps necessary to prevent the retaliation. Among other failures, Rhombus failed to investigate Col. Woodall's complaints, failed to intervene to stop the escalating adverse treatment, permitted the false October 23, 2025 personnel-security report to be filed and acted upon, excluded Col. Woodall from his work and team, placed him on administrative leave, and terminated him—all without any effective measure to prevent the very retaliation it had been warned against and had promised would not occur.

101. As a direct and proximate result of Rhombus's failure to prevent retaliation, Col. Woodall has suffered and continues to suffer damages, including lost wages, back pay, front pay, lost benefits, and lost future earnings, together with severe emotional distress, in amounts to be proven at trial. Col. Woodall is entitled to recover reasonable attorney's fees and costs, including expert fees, under California Government Code § 12965.

102. Rhombus's conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard for Col. Woodall's rights, and was committed and/or ratified by Rhombus's officers, directors, or managing agents, entitling Col. Woodall to punitive damages.

King & Siegel LLP

**<u>FIFTH CAUSE OF ACTION</u>**

***Wrongful Termination in Violation of Public Policy***

***Tameny v. Atlantic Richfield Co.***

**(Plaintiff Against Defendant Rhombus Power, Inc. and Does 1–10)**

103. Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

104. California recognizes a common-law tort cause of action for wrongful discharge where an employer terminates an employee for a reason that contravenes a fundamental public policy. *See Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167. To support such a claim, the public policy must be (i) delineated in a constitutional, statutory, or regulatory provision; (ii) public in nature rather than serving merely the interests of the individual; (iii) well established at the time of the discharge; and (iv) fundamental and substantial. See Stevenson v. Superior Court (1997) 16 Cal.4th 880.

105. Col. Woodall's termination contravened multiple fundamental, well-established public policies of the State of California and the United States, including: (a) the public policy embodied in California Labor Code § 1102.5 protecting employees who disclose information they reasonably believe evidences violations of law; (b) the public policy embodied in FEHA, California Government Code § 12940(h), protecting employees who oppose practices forbidden under FEHA, including the sexual harassment of a coworker or subordinate; and (c) the fundamental public policy favoring the protection of the national security of the United States and the safeguarding of classified information, reflected in the federal espionage laws and the statutes and regulations governing access to classified information and Sensitive Compartmented Information.

106. Rhombus terminated Col. Woodall's employment because he engaged in conduct protected by these public policies—namely, his disclosures concerning the unauthorized retention of and access to classified information and his

King & Siegel LLP

opposition to the sexual harassment of Ms. Khan. Col. Woodall's protected conduct was a motivating reason for his termination. Rhombus's stated reason for the termination—a purported reduction in force eliminating the Warfighting department—was a pretext, as demonstrated by, among other things, the close temporal proximity between Col. Woodall's protected conduct and his discharge, and Rhombus's rehiring of laid-off personnel shortly after the purported reduction in force.

107. As a direct and proximate result of Rhombus's wrongful termination of his employment in violation of public policy, Col. Woodall has suffered and continues to suffer damages, including lost wages, back pay, front pay, lost benefits, and lost future earnings, together with severe emotional distress, in amounts to be proven at trial.

108. Rhombus's conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard for Col. Woodall's rights, and was committed and/or ratified by Rhombus's officers, directors, or managing agents, entitling Col. Woodall to punitive damages.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. For reinstatement to Plaintiff's former position, or front pay in lieu thereof, and the restoration of all employment benefits and other terms and conditions of employment;
2. For actual, economic, and compensatory damages, including lost wages, back pay, lost benefits, and lost future earnings, according to proof at trial;
3. For compensatory damages for emotional distress, humiliation, and mental and emotional suffering, according to proof at trial;
4. For statutory and civil penalties, including the civil penalty of $10,000 per

violation under California Labor Code § 1102.5(f);

5. For punitive and exemplary damages according to proof;

6. For pre-judgment and post-judgment interest on all monetary damages, as allowed by law;

7. For reasonable attorney's fees and costs, and expert fees and costs; and

8. For such other and further relief as this Court deems just and proper.

DATED: July 16, 2026

Respectfully submitted,
**KING & SIEGEL LLP**

By: Robert J. King
Robert King
Julian Burns King
Attorneys for Plaintiff
Douglas R. Woodall



King & Siegel LLP

# Exhibit A

STATE OF CALIFORNIA | California Housing and Homelessness Agency GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

Civil Rights Department
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

July 16, 2026

Robert King
724 S. Spring Street
Los Angeles, CA 90013

RE: **Notice to Complainant's Attorney**
CRD Matter Number: 202607-36221916
Right to Sue: Woodall / Rhombus Power, Inc.

Dear Robert King:

Attached is a copy of your complaint of discrimination filed with the Civil Rights Department (CRD) pursuant to the California Fair Employment and Housing Act, Government Code section 12900 et seq. Also attached is a copy of your Notice of Case Closure and Right to Sue.

**Pursuant to Government Code section 12962, CRD will not serve these documents on the employer.** You must serve the complaint separately, to all named respondents. Please refer to the attached Notice of Case Closure and Right to Sue for information regarding filing a private lawsuit in the State of California. A courtesy "Notice of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the CRD does not review or edit the complaint form to ensure that it meets procedural or statutory requirements.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA | California Housing and Homelessness Agency
GAVIN NEWSOM, GOVERNOR
KEVIN KISH, DIRECTOR

Civil Rights Department
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

July 16, 2026

RE: **Notice of Filing of Discrimination Complaint**
CRD Matter Number: 202607-36221916
Right to Sue: Woodall / Rhombus Power, Inc.

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Civil Rights Department (CRD) in accordance with Government Code section 12960. This constitutes service of the complaint pursuant to Government Code section 12962. The complainant has requested an authorization to file a lawsuit. A copy of the Notice of Case Closure and Right to Sue is enclosed for your records.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation. The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. You may contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

Please refer to the attached complaint for a list of all respondent(s) and their contact information.

No response to CRD is requested or required.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA | California Housing and Homelessness Agency
GAVIN NEWSOM, GOVERNOR
KEVIN KISH, DIRECTOR

Civil Rights Department
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

July 16, 2026

Douglass Woodall
,

RE: **Notice of Case Closure and Right to Sue**
CRD Matter Number: 202607-36221916
Right to Sue: Woodall / Rhombus Power, Inc.

Dear Douglass Woodall:

This letter informs you that the above-referenced complaint filed with the Civil Rights Department (CRD) has been closed effective July 16, 2026 because an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation. The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. Contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

STATE OF CALIFORNIA | California Housing and Homelessness Agency GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

After receiving a Right-to-Sue notice from CRD, you may have the right to file your complaint with a local government agency that enforces employment anti-discrimination laws if one exists in your area that is authorized to accept your complaint. If you decide to file with a local agency, you must file before the deadline for filing a lawsuit that is on your Right-to-Sue notice. Filing your complaint with a local agency does not prevent you from also filing a lawsuit in court.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this CRD Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Civil Rights Department

**COMPLAINT OF EMPLOYMENT DISCRIMINATION**
**BEFORE THE STATE OF CALIFORNIA**
**Civil Rights Department**
**Under the California Fair Employment and Housing Act**
**(Gov. Code, § 12900 et seq.)**

**In the Matter of the Complaint of**
Douglass Woodall CRD No. 202607-36221916

Complainant,

vs.

Rhombus Power, Inc.

,

Respondents

---

**1.** Respondent **Rhombus Power, Inc.** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2**. Complainant **Douglass Woodall**, resides in the City of **,** State of **.**

**3**. Complainant alleges that on or about **July 16, 2026**, respondent took the following adverse actions:

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment and as a result was terminated, suspended, denied work opportunities or assignments.

**Additional Complaint Details:**

VERIFICATION

I, **Robert King**, am the **Attorney** in the above-entitled complaint. I have read the foregoing complaint and know the contents thereof. The matters alleged are based on information and belief, which I believe to be true. The matters alleged are based on information and belief, which I believe to be true.

On July 16, 2026, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**Sacramento CA**